UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | | |
|---|---|---|
| DENNIS M. McDANIEL, *et al.*, | ) | |
| on Behalf of themselves and All Others | ) | |
| Similarly Situated, | ) | |
| Plaintiffs, | ) | |
| | ) | |
| vs. | ) | 1:02-cv-0422-LJM-JMS |
| | ) | |
| NORTH AMERICAN INDEMNITY, N.V., | ) | |
| *et al.*, | ) | |
| Defendants. | ) | |

## FINDINGS OF FACT & CONCLUSIONS OF LAW AFTER COURT TRIAL

On March 24, 2008, plaintiffs, Dennis M. McDaniel and Vicki McDaniel, individually and as natural guardians of Jeremiah A. McDaniel, James K. Bush, and Karen Clark Bush, individually and as natural guardians of Jacob L. Bush, Linda Ann Perry, and Pedcor Investments, LLC. (these plaintiffs, collectively, "named plaintiffs"), on behalf of themselves and all others similarly situated (collectively, "class plaintiffs," or "plaintiffs"), appeared with counsel, Edward Price Steegman and G. Daniel Kelley, Jr., and defendants, North American Indemnity ("NAI"), Marsh Investment Corp., John Fowler Anderson ("Anderson"), and Euan D. McNicoll ("McNicoll") (all remaining defendants, collectively, the "NAI defendants"), despite repeated and adequate notice of these proceedings, sent and received by registered mail, fail to appear for a Court Trial on the merits of class plaintiffs' claims under the Employee Retirement Income Security Act of 1972 ("ERISA"), 29 U.S.C. § 1132, *et seq.* Having received evidence, the Court now enters the following Findings of Fact and Conclusions of Law:[1]

---

[1]Where appropriate or necessary, each of the following Findings of Fact shall be considered a Conclusion of Law, and each of the following Conclusions of Law shall be

# I. <u>FINDINGS OF FACT</u>

1.      This lawsuit seeks money damages on behalf of a plaintiff class under the private

action provisions of ERISA, 29 U.S.C. § 1132.  By Order dated January 27, 2003, the Court granted

plaintiffs' motion for class certification with respect to two subclasses:

> (1)  All participants and beneficiaries in ERISA welfare benefit plans administered by
> [American Heartland Health Administrators, Inc. ("AHHA")] and insured, reinsured or
> administered by NAI, having outstanding welfare benefit claims adjudicated as valid by
> AHHA between August 1, 2001 and September 28, 2001, which claims remain unpaid in
> whole in or in part;
>
> (2) All participants and beneficiaries in ERISA welfare benefit plans administered by
> [Managed Healthcare Inc. ("MHI")] since September 28, 2001 and insured, reinsured or
> administered by NAI, having outstanding welfare benefit claims adjudicated (at present or
> in the future) as valid by MHI, or unadjudicated to date by MHI, which claims remain unpaid
> in whole or in part.

By Order dated August 14, 2007, the Court granted Plaintiffs' Renewed Motion for Certification of

a "Limited Fund" Class under Federal Rule of Civil Procedure 23(b)(1)(B) with reference to the

same two subclasses.

2.      The NAI defendants are the insurers of ERISA welfare benefit plans in which the

named plaintiffs and class members are participants or beneficiaries.  In its Order on Plaintiffs'

Motion for Class Certification, the Court found the named plaintiffs to be adequate representatives

of the class and that their claims typify those of class members.  Jan. 27, 2003, Order, at 7-9.  The

evidence reflects that named plaintiffs Dennis and Vicki McDaniel (the "McDaniels") and James and

Karen Bush (the "Bushes") each have gravely injured minor children and have to date incurred many

thousands of dollars in medical expenses adjudicated as valid and subject to plan coverage by the

---

considered a Finding of Fact, or if a mixture of both fact and law, they shall be considered
accordingly.

third-party administrators, AHHA and Managed Healthcare, Inc.[2] ("MHI") (collectively, the TPA's), which the NAI defendants have not paid.  McDaniel Aff. ¶¶ 2 & 3; McDaniel Trial Test.; Bush Aff. ¶¶ 2 & 3; Bush Trial Test.; Trial Exs. 4, 10, 24, 26, 37 (EOB's and MHI claims reports for named plaintiffs).

3.        Since the January 27, 2003, Order granting class certification, the McDaniels and the Bushes have incurred additional medical expenses not paid by NAI.  McDaniel Trial Test.; Ex. 20; Bush Trial Test.  Named plaintiff Linda Ann Perry incurred thousands of dollars in medical expenses adjudicated as valid by AHHA and which NAI has not paid.  Perry Aff. ¶¶ 2 & 3; Perry Dep. & Exs. thereto; Exs. 24-25.  Named plaintiff, Pedcor Investments LLC, as the assignee of its participants' claims, has also incurred thousands of dollars in adjudicated-valid claims, which remain unpaid by NAI.  George Aff. ¶ 8, Ron Berry Dep. & Exs. thereto.

4.        As the Court found in its initial order granting Plaintiffs' Motion for Class Certification, the named plaintiffs' claims typify those of the other class members, participants and beneficiaries in approximately 409 ERISA welfare benefit plans throughout the country insured by the NAI defendants and administered first by AHHA and subsequently by MHI.  George Aff. ¶ 2; George Trial Test.  Class plaintiffs presented the testimony of Michael George ("George"), an independent insurance agent associated with the Regit Inc. agency headquartered in Indianapolis, Indiana.  According to George's testimony at the trial in this matter, approximately 200 of the welfare benefit plans within the class definition were associated with Regit and he has personal knowledge of the matters relating to those plans.

---

[2]AHHA and MHI, originally defendants in this cause, have filed for bankruptcy and thus are no longer active parties in this matter.  The NAI defendants are the sole remaining defendants.

5.      In each instance, at the recommendation of AHHA, the employer-sponsors of the plans entered into "Reinsurance Agreements" with NAI on behalf of the plans. George Aff. ¶ 3; George Trial Test.  Among the plans entering into these Reinsurance Agreements with NAI were those of Pedcor Management Co., Inc., M.L. Anderson Construction Inc. (plan sponsor to named plaintiffs James Bush and Karen Clark Bush), DVM Corporation d/b/a Interstate Batteries (plan sponsor to named plaintiffs Dennis and Vicki McDaniel) and Blue River Medical Group PC (plan sponsor to named plaintiff Linda Ann Perry). Trial Exs. 1, 21B, Berry Dep. Ex. 1 (named plaintiffs' Reinsurance Agreements).

6.      The "Reinsurance Agreement" between NAI and the class plans was a "form" document containing identical or substantially similar terms as among the named plaintiffs' plans and the remainder of the approximately 409 class plans. George Aff. ¶ 5 & Ex. A thereto; George Trial Test. The "Reinsurance Agreements" reflected that "the reinsurer has agreed to accept 100% of the reinsured's liability in terms of the plan, except the first $\underline{0}$ of liability arising from the plan." George Aff., Ex. A, Second Recital.  In fact, the evidence reflects that the NAI defendants were not legitimate reinsurers providing stop-loss or other coverage for insurers.  Rather, NAI established an unauthorized, unlicensed insurance business in the United States through the subterfuge of "reinsurance" of "self-funded" ERISA plans.[3]

_____

[3]*See Connelly Mgmt. Inc. v. McNicoll*, Civil Action No. 2:02-cv-2440-PMD-GCK, Findings & Concls., at 28-30,  ¶ 43 (D.S.C. March 15, 2006) (hereinafter "*Connelly Mgmt.* Opinion"); Claro Dep. Exs. 465 (Indiana Commissioner of Insurance order that required NAI, Anderson and McNicoll to cease and desist their unauthorized business of insurance in Indiana), 483 (Colorado Division of Insurance cease and desist Order against NAI), 486 (Mississippi Insurance Department cease and desist notice against NAI's unauthorized business of insurance in Mississippi), 487 (Alabama Department of Insurance cease and desist order against NAI), 493 (Texas Commission of Insurance emergency cease and desist order against NAI, Anderson and McNicoll); *see also* Trial Exs. 31-35.

4

7.     Although the plans purported to be "self-funded," in fact the purported "Reinsurance Agreements" between NAI and the plans reflect that NAI agreed to accept 100% of the liability under the plans.  As a matter of law under ERISA, the plans themselves were not in the business of insurance.  ERISA § 514(b)(2)(B) expressly states that ERISA welfare benefit plans are not in the business of insurance for purposes of any State law.  29 U.S.C. § 1144(b)(2)(B).  Because the plans themselves were not in the business of insurance, then, NAI was acting as the plans' insurer (albeit an unlicensed and unlawful insurer), and not as a "reinsurer" of insurance companies providing primary coverage to the plans.  *See Connelly Mgmt. Inc. v. McNicoll*, Civil Action No. 2:02-cv-2440-PMD-GCK, Findings & Concls., at 28-30 & n.38,  ¶ 43 (D.S.C. March 15, 2006) (Supp. Trial Ex. 1) (hereinafter "*Connelly Mgmt.* Opinion"); *see also Home Health Care Affiliates of Miss., Inc. v. Am. Heartland Health Admins., Inc.*, No. 1:01-cv-00489-D-A, 2003 WL 24046753, at *6 (N.D. Miss. Mar. 21, 2003) (holding that NAI "labeling its coverage stop-loss or 'reinsurance' does not mask the reality that it is close to a simple purchase of group accident and sickness coverage.  Thus, it is not a legitimate stop-loss policy, but is more akin to insurance"); U.S. Dep't of Labor Advisory Opinions 2003-03A & 92-21(A) (finding that NAI and like "reinsurers" of self-funded ERISA plans are acting as insurers subject to regulations by the States) (Supp. Trial Ex. 6); Trial Exs. 31-35 (cease and desist orders against NAI from the States of Indiana, Colorado, Mississippi, Alabama and Texas).  Hence, the Court agrees with the court in the cause styled *Connelly Management, Inc. v. McNicoll*, Civil Action No. 2:02-cv-2440-PMD-GCR (D.S.C.) ("*Connelly Management* court"), the U.S. Department of Labor (Advisory opinions 2003-03A and 92-21A), and several States' commissioners of insurance, that NAI's "reinsurance" label was merely a subterfuge to avoid State-law regulation by the States' departments of insurance.  As the Texas

5

Department of Insurance, for example, recognized in issuing a cease and desist order against NAI, the "Reinsurance Agreements" reflected that NAI was acting as an unauthorized and unlicensed insurer and not as a "reinsurer" covering the obligations of other insurers after a specified attachment point. *See* Trial Ex. 35; *see also* Trial Exs. 31-34.

8.      No doubt owing to the unlawful character of its business, NAI was formed by defendants Anderson and McNicoll to be an "offshore" company that would maintain plan assets outside the territorial jurisdiction of the United States, in violation of ERISA § 404(b), 29 U.S.C. § 1104(b).  As the Court recognized in its August 14, 2007, Order granting Plaintiffs' Renewed Motion for Certification of a Limited Fund Class, NAI was substantially undercapitalized by Anderson and McNicoll in relation to claims adjudicated valid by the TPA's under the "Reinsurance Agreements."  Aug. 14, 2007, Order, at 4.

9.      Under the plan documents, welfare benefit claims made by plan participants and beneficiaries (the class members here) were sent to the TPA's (first AHHA and later MHI) for a coverage adjudication.  Horn Dep. at 16.  Approved claims were then forwarded to NAI on a bi-monthly basis for payment.  George Aff. ¶ 6; George Trial Test.  NAI was then required by the "Reinsurance Agreements" to pay the class members' health care and prescription providers directly with a summary of payments and "Explanation of Benefits" form provided by the TPA's to the participants/beneficiaries.  *Id.*  In practice, throughout the period subject to the class definition, the TPA's collected money from the plans, took a 30% cut of the gross as an "administrative fee" and then sent the balance by wire transfer to NAI's offshore bank accounts in Brussels, Belgium, Luxembourg and Nassau, Bahamas.  *Id.*; Horn Dep. at 38-40, 65-68, 81-83 ; Claro Dep. Vol. III, at 170; Claro Dep. Vol. IV, at 572.

Specifically, with respect to maintenance of plan assets offshore by the NAI defendants,

MHI's president, Edwin Horn ("Horn"), testified as follows:

> Q.     And just so I am clear, the contributions were where you guys were suppose[d] to put the money that the employers were sending in every month?
>
> A.     That is correct.
>
> Q.     Alright.  What was suppose[d] to happen?  How was the money suppose[d] to flow from that account into the claims account?
>
> A.     There was a board ruling established by [NAI] and by the Agreement that they had with the plan sponsor that said dollar amount[,] of percentage contribution amount[,] would go to administrative fees, too – and it[s] claims.  And what we would end up doing is we would take the contribution – their instruction was, the amount that would go to [NAI], that was shipped, transferred to whatever bank accounts that they set up.
>
> Q.     In Belgium?
>
> A.     In Belgium . . . ."

Horn Dep. at 81-83.  And, Mr. John Anthony Claro ("Claro"), an attorney who represented AHHA

in proceedings in Texas, testified as follows:

> Q.     I will hand you what has been marked Plaintiffs' Exhibit 366.  The computer reflects an [AHHA] wire transfer of $792,434[.00] to the account of McSooner Inc. at Barclay's Bank in Nassau, Bahamas.
>
> A.     That sounds like another premium payment to me.  I don't know that I can identify this.  I know there were two premium payments sent to McSooner and later McSooner advanced them on to NAI's company account in Brussels. . . .
>
> Q.     And it's your testimony that those wire transfers were moved from the McSooner, Inc., account of NAI at KBC Bank in Brussels, Belgium?
>
> A.     Yes, I think.

Claro Dep. Vol. III, at 170.  Claro also testified:

Q.     Okay, and then the premiums were effectively moved out of the reach of the U.S. employers before [NAI's] default.  In other words, they were not placed into an intermediary account, they were placed offshore, effectively out of reach of the U.S. employer at some time?

A.     That's right. . . .

Claro Dep. Vol. IV, at 572.  *See also Connelly Mgmt.* Opinion, at ¶¶ 42, 97 & 106.

10.     On the basis of this and other exertions of control over plan assets by the NAI defendants, the Court's August 14, 2007, Order held that the NAI defendants are ERISA fiduciaries. Aug. 14, 2007, Order, at 1-2.  Specifically "when Anderson and McNicoll wired plan assets offshore and in that fashion seized control of plan assets, they became subjected to personal responsibility as fiduciaries under ERISA."  *Id.* at 2.  The NAI defendants caused these plan assets to be wired offshore in direct violation of ERISA § 404(b), which provides that "no fiduciary may maintain the indicia of ownership of any assets of a plan outside the jurisdiction of the district courts of the United States."  29 U.S.C. § 1104(b).

11.     Beginning in August 2001 and at all times thereafter, NAI began refusing to pay claims of the class members that had been adjudicated as valid and subject to coverage by the TPA's (first AHHA and then MHI).  George Aff. ¶ 7; George Trial Test.  As George attested:  "Since August 2001, I believe NAI has not paid any claim in excess of $500 submitted by the Regit-associated class plans and adjudicated as valid by the TPA's.  Since January 2002, NAI has refused to pay claims of any size submitted by the class plans of which I am aware and adjudicated as valid by the TPA's."  George Aff. ¶ 7.  The record reflects that NAI refused to pay the claims not for any valid reason - all claims embraced by plaintiffs' class definition were determined to be valid and subject to insurance coverage by the TPA's - but because Anderson and McNicoll wanted to

keep the money.  Horn Dep. at 32-33, 79-82, 89, 94; Claro Dep. Vol. III, at 342-345; Claro Dep. Vol.

IV, at 470, 472-73, 572-73.

MHI's President, Horn, testified:

> Q.     What did [Anderson and McNicoll] tell you about funding claims when you went to London?
>
> A.     That they still had the intent to fund, that they were doing some audits on the previous administrator, and that they were finding some weird things in their minds, but that they were going to go ahead and fund the outstanding claims.
>
> Q.     Did they do that?
>
> A.     No.
>
> Q.     When did that end?
>
> A.     In this timeframe [sic] of mid-January 2002, they — they meaning Mr. McNicoll and Mr. Anderson — contradicted an earlier commitment that they were going to be sending – funding a number of claims runs that we had funding requests that we had – that we sent them.  And they were very clearly at this point said they're not going to process any more – pay any more claims until there is a complete audit of all the various plans.  At that point, we made a determination that we would communicate with the clients and let them know that, and which we did.

Horn Dep. at 79-80.  Horn also testified:

> Q.     Alright.  What about the already adjudicated but not funded claims above $500?
>
> A.     Those, to my knowledge, were still being researched and tried to be resolved at the I guess tenure of this relationship.
>
> Q.     Well, did [MHI] readjudicate those claims?
>
> A.     Yes.
>
> Q.     And present those to North American for payment?
>
> A.     Yes.

9

Q.     But North American didn't pay them.

A.     No.

*Id.* at 89.  Horn continued:

Q.     Do you think [Anderson and McNicoll] ever had any intent of funding these claims after they came to [MHI]?

A.     I had the express belief in their statements to not only ourselves but to every client that I was a party of a three way or other conversation, that they were going to fund and they were willing to upon proper documentation.

Q.     When you look back on it now with the benefit of hindsight, what do you think?

A.     I – I can only conclude that they didn't.

*Id.* at 94.

12.     Further, as AHHA's attorney, Claro, testified:

Q.     And it's [the plans'] fault if they get hooked up with a foreign reinsurance company who defrauds them, it's their fault?
A.     I don't know whether there is fraud in every instance, but there is the default and if you move offshore and you take a less well-established carrier that is unlicensed, that's more risky.  I mean, that's - everybody knows that.

Q.     Let's not mince words - there is fraud written all over NAI; isn't that correct?

A.     NAI, I agree with you.

* * *

Q.     So people are dying of cancer and going without health treatment and having their bills [left unpaid] because McNicoll is feeding his family off the money that is not being used to pay these claims?

A.     I say he was complicit in it and I think the man who was making the decisions is Anderson.

* * *

10

> Q.     Anderson is involved in the [NAI] fraud from the beginning; isn't that correct?
>
> A.     I think that is definitely true, yes.
>
> * * *
>
> Q.     And we know that McNicoll and Anderson stole the money because we know that it was $13, $14 million paid to them and they only paid, what, by your estimate $5, $6 million in claims?
>
> A.     I have forgotten those figures. I think it was a little bit more than that, but I sure think there are funds that are in their possession somewhere that are the fruit of their default here.

Claro Dep. Vol. III, at 342-43, 344-45.

13.     The NAI defendants' refusal to pay claims on a class-wide basis is also confirmed by the testimony of each of the named plaintiffs and, as to hundreds of plans, by George's affidavit and testimony, as well as the affidavits and trial testimony of the named plaintiffs.  George Aff. ¶ 7; McDaniel Aff. ¶ 4; Bush Aff. ¶ 4; Perry Aff. ¶ 3; George Trial Test.; McDaniel Trial Test.; Bush Trial Test.; Perry Dep.  As George attested, "NAI's refusal since August 2001 to pay welfare benefit claims adjudicated as valid by the TPA [is] typical of that of the other class plans with which I am familiar."  George Aff. ¶ 7.

14.     The Findings of Fact by the Court by the *Connelly Management* court, are in accord with reference to each of the approximately 409 plans (class members in the related case, *Connelly Management Employee Welfare Benefit Plan v. North American Indemnity, N.V.*, Cause No. 1:07-cv-540-LJM-JMS ("*Connelly Management II*"), also before this Court and tried at the same time as the instant cause).  The *Connelly Management* court expressly found that NAI's default was "pre-planned" and the culmination of a decade-long scheme to sell unlawful insurance involving

11

many of the same actors, including McNicoll.  *See Connelly Mgmt.* Opinion, at ¶¶ 37, 40, 93, 114.

This Court adopts and incorporates those findings by reference herein.  But, most specifically, finds

that

> the evidence established [that] . . . McNicoll [and] Anderson . . . executed an ERISA
> health insurance scam in the United States in which NAI, a fraudulent and
> undercapitalized Belgian reinsurance company, established as a front to perpetrate
> the repetitive ERISA health insurance scam, failed to pay over $10 million in medical
> claims of approximately 12,000 employees and their dependents who were covered
> under the fake health plan which was purchased by approximately 490 U.S.
> companies located throughout the United States. . . .  The ERISA health insurance
> scam, which was repetitively executed by essentially the same principal actors for
> approximately a decade resulted in tens of millions of dollars in unpaid medical
> claims incurred by the employees of small businesses in the U[nited] S[tates].

*Connelly Mgmt.* Opinion, ¶¶ 37, 40.  *See also id.* ¶ 47 ("The ERISA health insurance scam alleged

in Plaintiffs' Complaint has been repeated by the same principal actors for over a decade using

essentially the same structure.  A foreign reinsurance company is formed by the actors, often in

Belgium where regulation of reinsurance companies is "notoriously lax."  In almost every instance,

McNicoll was the individual that executed the reinsurance agreement on behalf of the foreign

company. . . .   Premiums were collected through intermediaries, which are other companies formed

by the principal actors, and then moved through backing channels established by the actors or

thorugh foreign venues, such as Luxembourg, which have strict banking secrecy laws.").

> In sum, this Court agrees with the *Connelly Management* court and concludes

> that the justifications given by Anderson and McNicoll for NAI's non-payment of
> claims were contrived and not legally valid.  In fact, the refusal to pay plaintiffs'
> medical claims was motivated by the desire of Anderson, [and] McNicoll . . . to
> unlawfully make a large profit through actions specifically intended to injure
> plaintiffs by obtaining premium money from plaintiffs (as well as from other
> companies and their employees) through the use of NAI, a fraudulent,
> undercapitalized and unlicensed company which sold an unauthorized health
> insurance policy. . . .

*Connelly Mgmt.* Opinion, at ¶¶ 49, 107, 112  ("NAI simply kept (or stated bluntly, stole) the premiums and did not pay plaintiffs' claims.").

15.    NAI's refusal to pay claims adjudicated valid by the TPA's since August 2001 is further documented in an October 5, 2001, memorandum prepared by AHHA's Jack Ferguson ("Ferguson") and received by George at Regit in the normal course of business.  George Aff. ¶ 11 & Ex. E; George Trial Test.  As described in the Memorandum:

> In August 2001, American Heartland presented its normal claims run on the 1st and 16th and was met with silence.  (Each of those claims runs was also in excess of the premium collected for the period.)  Finally, after repeated requests to NAI for funding, we received a letter from NAI dated September 19th informing us that they were going to withhold funding of all of the August claims and perform an 'audit' (as all of you are aware, those claims are still overdue today and NAI has yet to conduct its audit).  We have repeatedly requested that NAI provide specific information, on any specific claim, which it believes is incorrect, so it can be addressed . . . .  We were told that the total of the claims 'was too high!'

George Aff. Ex. E; George Trial Test.

16.    Subsequent to August 2001, AHHA's successor as third-party administrator, MHI, was likewise unable to secure payment of the adjudicated-valid claims by NAI.  George Aff. ¶ 10; George Trial Test.; Horn Dep. at 32-33, 79-82, 89, 94.  Indeed, in letters dated March 5, 2002, and March 22, 2002, to the named plaintiffs' and to the class plaintiffs' plans, NAI acknowledged on a class-wide basis that it was refusing to pay claims adjudicated as valid by the TPA's.  George Aff. Exs. F & G ("North American Indemnity has suspended any further indemnity to the plans."); George Trial Test.  NAI asserted entitlement to over $4 million in additional payments from plan assets before it would pay any claims, even those already adjudicated as valid by the TPA's, thereby effectively impounding plan assets to which the class members are entitled.  George Aff. ¶ 12; August 14, 2007, Order, at 2 ("Therefore, when Anderson and McNicoll wired plan assets offshore

and in that fashion seized control of plan assets, they became subjected to personal responsibility as fiduciaries under ERISA").

17.     While the NAI defendants' failure to appear in this matter and failure to cooperate with discovery has impeded plaintiffs' development of evidence respecting the total claims left unpaid by NAI, the best available evidence (for 283 of the 409 class plans) indicates $10,320,418.00 in adjudicated-valid but unpaid claims to class members during the period subject to the class definition.  This total is based on the claims summary (itemized by plan and participant name) produced by defendant MHI prior to its bankruptcy in this matter.  Ex. 37.  This exhibit is authenticated by MHI Response to Request for Admission No. 1.  Ex. 27.

18.     As described in the Conclusions of Law below, § 409 of ERISA, 29 U.S.C. § 1109(a), measures damages for breach of fiduciary duty both in terms of contractual loss to the plans resulting from the breach (here, the $10,320,418.00 in unpaid claims) and disgorgement of any profit derived from the breach by the NAI defendants.  With respect to members of sub-class no. 1 (the AHHA participants), the best available evidence indicates that NAI made a profit of $5,077,336.00.  Claro Dep. Ex. 430; Claro Dep. Vol. IV, 472-73, 777-78; *Connelly Mgmt.* Opinion, ¶ 112 ("According to AHHA records between September 2000 and October 31, 2001[,] NAI made a profit of $5,077,366.55 and claims as a percentage of premiums was 81.64%.").

19.     With respect to subclass no. 2 (the MHI participants), the evidence indicates an additional profit of $4,674,116.00.  *See* MHI First Admissions ¶ 2, Bates Nos. MHI0005-0048, reports entitled "Employer Sponsored Plans Contributions Received" by MHI from October 2001 through at least February 26, 2002; Class Plaintiffs' Resp. to Defs.'Managed Healthcare Inc. and Edwin E. Horn's First Set of Interrogs. at 7, Ans. to Interrog. No. 1.  The NAI defendants' profit with

respect to subclass no. 2 is additionally reflected in documents produced by MHI entitled "Report All NAI Premiums Collections.XLS" and "NAI-Individual Group Disposition Report," as authenticated by MHI's Response to Class Plaintiffs Request for Admission No. 1.  Trial Exs. 27A; 37.

## II.  CONCLUSIONS OF LAW

1.    As described in the Court's March 20, 2003, Order denying the NAI defendants' Motion to Dismiss, the NAI defendants were personally and properly served with valid process in this matter while physically present in the United States conducting NAI's business.  Mar. 20, 2003, Order, at 5-8.  As the Court determined in that Order, ERISA § 502(e)(2) authorizes nationwide service of process.[4]  29 U.S.C. 1132(e)(2).  "Thus, if a defendant is personally served in any district in the United States, the district court in which the suit has been filed has personal jurisdiction over the defendant, regardless of the defendant's contacts with the forum district."  *Id.* at 5.  *See also Bd. of Trustees, Sheet Metal Workers Nat'l Pension Fund v. Elite Erectors, Inc.*, 212 F.3d 1031, 1035-36 (7th Cir. 2000).  The relevant inquiry in this context is the defendants' contacts with the United States as a whole, not their contacts with a particular forum State.  *Id.*  As the Court determined in its March 20, 2003, Order, defendants Anderson and McNicoll were personally served with process

---

[4]Section 502(e)(2) states:  "Where an action under this subchapter is brought in a district court of the United States, it may be brought in a district court where a plan is administered, where the breach took place, or where a defendant resides or may be found, and process may be served in any other district where a defendant resides or may be found."  29 U.S.C. § 1132(e)(2). In this case, the named plaintiffs' plans were administered, and the NAI defendants' breaches of fiduciary duty took place in part, in this district.  The Court's March 20, 2003, Order determined that the NAI defendants reside and may be found in the United States based on the NAI defendants' contacts with the nation as a whole.

15

while physically present in the United States on NAI business.  Anderson and McNicoll "were personally served in their individual capacities, as well as their capacities as principals of NAI and Marsh."  *Id.* at 6.  Such service is valid and fully comports with due process notions of fundamental fairness.

2.     The Court's March 20, 2003, Order also determined that this Court has personal jurisdiction over the NAI defendants, and each of them.  *Id.* at 7-8.  The Court held that

> Anderson, McNicoll and NAI conducted a sufficient amount of business in the United States to establish minimum contacts.  NAI was formed for the purpose of doing business with ERISA plans in the United States.  Anderson and McNicoll traveled to the United States several times to conduct business.  NAI apparently collected premium payments in a United States bank account for some time. Anderson, McNicoll and NAI have initiated other legal action in the United States. This Court's personal jurisdiction over them does not offend the notions of substantial justice and fair play.

*Id.* at 8.  The Court further held that defendant Marsh Investment Corp. is subject to the Court's jurisdiction as an affiliate or alter ego of NAI.  *Id.*

3.     The analysis in this Court's March 20, 2003, Order is supported by the similar holding of the *Connelly Management* court with reference to NAI defendants Anderson and McNicoll. *Connelly Mgmt.* Order, ¶¶ 72-76.  This Court agrees with that analysis and adopts it by reference and by partial incorporation herein:

> The provision of the Reinsurance Agreement which states it would be 'construed and enforced according to the laws of the United States of America' constitutes an agreement or assent by McNicoll, Anderson and Reeve to submit any dispute arising out of the Reinsurance Agreement to the jurisdiction of a federal court in the United States.  The federal courts of the United States construe and enforce the laws of the United States in cases involving federal law.  28 U.S.C. § 1331.  The choice of the United States law provision used by McNicoll, Anderson and Reeve in the Reinsurance Agreement, which was the instrumentality used to injure plaintiffs, amounts to an express agreement by McNicoll, Anderson and Reeve to submit to the jurisdiction of this Court.  The choice of the United States law provision is an

16

additional basis for this Court to exercise personal jurisdiction over said defendants
as to plaintiffs' claims which arise out of the Reinsurance Agreement.

*Connelly Mgmt.* Order, ¶ 76.

4.      In addition to valid service of the Complaint, which supports this Court's exercise
of personal jurisdiction over the NAI defendants, the record reflects that, notwithstanding their
failure to appear and defend in this matter, the NAI defendants and their counsel have been served
by plaintiffs with all relevant papers filed herein by international, registered mail.  Ex. 39.  Once
again, all notions of fair play and substantial justice have been satisfied by these proceedings.
Despite adequate notice, the NAI defendants unaccountably chose to ignore them.

5.      Class plaintiffs seek relief in relevant part for the NAI defendants' breaches of
fiduciary duty under ERISA §§ 409(a) and 502(a)(2), 29 U.S.C. §§ 1109(a) and 1132(a)(2).  ERISA
§ 409(a) sets forth the standard of liability and measure of damages for breach of fiduciary duty:

> Any person who is a fiduciary with respect to a plan who breaches any of the
> responsibilities, obligations, or duties imposed upon fiduciaries by this subchapter
> shall be personally liable to make good to such plan any losses to the plan resulting
> from each such breach, *and* to restore to such plan any profits of such fiduciary which
> have been made through use of assets of the plan by the fiduciary. . . .

29 U.S.C. § 1109(a) (emphasis added).  ERISA § 502(a)(2) provides a private right of action "by a
participant, beneficiary or fiduciary for appropriate relief under Section 1109 of this title" governing
breaches of fiduciary duty.[5]  29 U.S.C. § 1132(a)(2).  *See, e.g.*, *Harzewski v. Guidant Corp.*, 489 F.3d
799, 804-805 (7th Cir. 2007) (stating that ERISA plan participants have standing under § 409 to seek
money damages in the amount of contractual benefits owed as against breaching fiduciaries).  The

---

[5]The class of plaintiffs in *Connelly Management II* seek relief under ERISA § 502(a)(2).

*McDaniel* class consists of participants and beneficiaries who are expressly provided a right of action against the NAI defendants, as fiduciaries, under § 409 of ERISA.  29 U.S.C. § 1109.

6.      Class plaintiffs' Complaint also states a claim for benefits under § 502(a)(1) and for injunctive and other equitable relief under § 502(a)(3).[6]  29 U.S.C. § 1132(a)(1) & (3).  The claims for injunctive or other equitable relief probably are moot at this stage inasmuch as neither the NAI defendants nor the other original named defendants in this matter purport to continue to act in any capacity relative to the plans or class members.  Class plaintiffs' claims for benefits under § 502(a)(1) remain at issue but are largely redundant at this point in time given the recent holding in *Harzewski* that participants have standing under § 409(a) to seek monetary damages against fiduciaries who have breached their duty.  *Harzewski*, 489 F.3d at 804-05.

7.      ERISA was enacted to provide nationwide standards governing employee pension and welfare benefit plans for the protection of plan participants and beneficiaries.  29 U.S.C. § 1101(a). It is the act's policy "to protect interstate commerce and interests of participants in employee benefit plans and their beneficiaries . . . by establishing standards of conduct, responsibility, and obligation for fiduciaries of employee benefit plans, and by providing for appropriate remedies, sanctions, and ready access to the federal courts."  29 U.S.C. § 1101(b).

8.      ERISA § 404(a) requires that "a fiduciary shall discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries" and "for the exclusive purpose of providing benefits to participants and their beneficiaries. . . ."  The fiduciary must act "with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in

_____

[6]Specifically, the Complaint sought an affirmative injunction removing defendants from their respective capacities in connection with the plans.

18

a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims. . . ."  The fiduciary must also act "in accordance with the documents and instruments governing the plan insofar as such documents and instruments are consistent with the provisions of this subchapter. . . ."  29 U.S.C. § 1104(a).

       9.     ERISA § 404(a) provides, in pertinent part:

> [A] fiduciary shall discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries and for the exclusive purpose of providing benefits to participants and beneficiaries and . . . with the care, skill, prudence and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims. . . .

29 U.S.C. § 1104(a).  Thus, the duties of ERISA fiduciaries have been described as "the highest known to law," because they require those impressed with such duties to act "solely in the interest of plan participants and beneficiaries," for the "exclusive purpose" of providing benefits to them and as a prudent person would act under the circumstances.  *Kuper v. Iovenko*, 66 F.3d 1447, 1452-58 (6th Cir. 1995); *Donovan v. Bierwirth*, 680 F.2d 263, 271-72 (2d Cir. 1982).  The Seventh Circuit has emphasized that the fiduciary duty imposed by ERISA "is far more exacting than the duty imposed by tort law not to mislead a stranger."  *Harzewski*, 489 F.3d at 805-06.  In other words, the

> burden of proving fraud is heavier than that of proving a breach of fiduciary duty. . . . Such a breach might consist in imprudent management (for example, failure to diversify), mistake, self-dealing and other conflicts of interest, or failure to remedy breaches of a fiduciary duty by a co-fiduciary - all examples of misfeasance rather than malfeasance, involving no misrepresentations, and in short, falling short of fraud.

*Id.* at 805.

10.     Representing in part a codification of common law trust standards,[7] ERISA § 404(a) "embod[ies] a carefully tailored law of trusts, including the familiar requirements of undivided loyalty to beneficiaries, the prudent man rule, the rule requiring diversification of investments and the requirement that fiduciaries comply with the provisions of plan documents to the extent that they are not inconsistent with the Act." *Eaves v. Penn*, 587 F.2d 453, 457 (10th Cir. 1978). In addition to the foregoing requirements, ERISA § 404(b) provides that "no fiduciary may maintain the indicia of ownership of any assets of a plan outside the jurisdiction of the district courts of the United States." 29 U.S.C. § 1104(b).

11.     ERISA fiduciaries have an affirmative duty to disclose material facts to plan participants. "Fiduciaries must also communicate material facts affecting the interests of beneficiaries." *Anweiler v. Am. Elec. Power Serv. Corp.*, 3 F.3d 986, 991 (7th Cir. 1993). *See also Rosen v. Hotel & Rest. Employees & Bartenders' Union*, 637 F.2d 592, 599-600 (3d Cir. 1981). "This duty exists when a beneficiary asks fiduciaries for information, and even when he or she does not." *Anweiler*, 3 F.3d at 999). *See also Harzewski*, 489 F.3d at 805-06 (stating that the ERISA fiduciary duty goes beyond a duty to avoid affirmative misrepresentation and embodies a "principle . . . far more exacting than the duty imposed by tort law not to mislead a stranger"); *Vescom Corp. v. Am. Heartland Health Adm'rs, Inc.*, 251 F.Supp.2d 950, 959-60 (D. Me. 2003) (holding that as an ERISA fiduciary, AHHA had an affirmative duty to speak so as to notify participants and

---

[7]This point is confirmed by ERISA's legislative history. "The principles of fiduciary conduct are adopted from existing trust law, but with modifications appropriate for employee benefit plans. These salient principles place a two-fold duty on every fiduciary: to act in his relationship to the plan's fund as a prudent man in a similar situation and under like conditions would act, and to act consistently with the principles of administering the trust for the exclusive purposes previously enumerated." H.R. No. 93-533 (October 2, 1973), *as reprinted in* 1974 U.S.C.C.A.N. 4639, 4651.

beneficiaries of financial problems with Merrion Reinsurance Co., one of NAI's many bogus predecessors as the plans' "reinsurer").

  12. Exertion of control over plan assets vests the party having such control with fiduciary status. ERISA's definition of "fiduciary" in § 3(21)(A) states: "a person is a fiduciary with respect to a plan to the extent (i) he exercises any discretionary authority or discretionary control respecting management of such plan or exercises any authority or control respecting management or disposition of its assets. . . ." 29 U.S.C. § 1002(21)(A)(i). Consistent with the plain language of ERISA § 3(21)(A), case law makes clear that any control over plan assets, as for example check writing or other authority on bank accounts holding such assets, makes the party a fiduciary regardless of whether any "discretion" is involved. *See Coldesina v. Simper*, 407 F.3d 1126, 1132-34 (10th Cir. 2005); *IT Corp. v. Gen. Am. Life Ins. Co.*, 107 F.3d 1415, 1421 (9th Cir. 1997).

  13. In its August 14, 2007, Order that granted Class Plaintiffs' Motion for Determination of NAI Defendants' ERISA Fiduciary Duty, this Court cited *Coldesina* and *IT Corp.* with approval when it held that the NAI defendants are ERISA fiduciaries. Aug. 14, 2007, Order, at 1-2. The Court so concluded because NAI assumed authority to grant or deny benefit claims and because "when Anderson and McNicoll wired plan assets offshore and in that fashion seized control of plan assets, they became subjected to personal responsibility as fiduciaries under ERISA." *Id.* The Court also concluded that Anderson and McNicoll are personally responsible as fiduciaries without regard to NAI's corporate form or traditional veil-piercing analysis. *Id.* at 2 (citing *Stewart v. Thorpe Holding Co. Profit Sharing Plan*, 207 F.3d 1143, 1156-57 (9th Cir. 1999); *Leigh v. Engle*, 727 F.2d 113, 133-36 (7th Cir. 1984)).

14.     Based on the foregoing Findings of Fact, the Court concludes that the NAI defendants (and each of them severally) have breached their fiduciary duties to the named plaintiffs and class plaintiffs in minimally the following ways:

- The NAI defendants operated an unlicensed and unauthorized business of insurance in the United States under the legal subterfuge of providing "reinsurance" to ERISA plans.  Findings of Fact ¶¶ 6-7.

- The NAI defendants caused plan assets to be wired and maintained outside the territorial jurisdiction of the United States in violation of ERISA § 404(b). Findings of Fact ¶¶ 9-10.

- NAI was substantially undercapitalized by defendants Anderson and McNicoll in relation to its adjudicated-valid claims obligations under the purported "Reinsurance Agreements."  Findings of Fact ¶ 8.

-  NAI perpetrated a pre-planned default in the payment of valid insurance claims to the named plaintiffs and class plaintiffs motivated by the self-dealing desire of Anderson and McNicoll to keep premium proceeds. Findings of Fact ¶¶  11-16.

- The NAI defendants attempted to perpetuate their unlawful insurance business by secretly negotiating to purchase the purportedly independent third-party administrator, Managed Healthcare Inc., a material fact which was required to be, but was not, disclosed to the named plaintiffs and class plaintiffs.  King Dep.; Ex. 88; *Connelly Mgmt.* Opinion, ¶¶  78(m) & 111.

- Through its letters dated March 5, 2002, and March 22, 2002, to the named plaintiffs' and class plaintiffs' plans, the NAI defendants improperly attempted to extort over $4 million in additional, retroactive "premium payments" from the plans to which NAI was not entitled under the plan documents. NAI stated that it would not pay any claims, even those already adjudicated as valid by the TPA's, unless this improper additional payment was made to Anderson and McNicoll. Findings of Fact ¶ 16.

- At all times since August 2001, the NAI defendants have failed to cure the foregoing breaches of fiduciary duty. The NAI defendants have also failed to cure the breaches of fiduciary duty attributable to the AHHA and MHI defendants, as they were obligated to do by ERISA § 405(a), 29 U.S.C. § 1105(a).[8]

- The NAI defendants additionally breached their fiduciary duties by failing to disclose the foregoing material facts to the named plaintiffs and class plaintiffs. Instead, the NAI defendants concealed these facts so as to induce the class plans and participants to make further premium payments to NAI.

15. Under ERISA § 409(a), once a breach of fiduciary duty is established, the Seventh Circuit has held that the burden shifts to the defendants to show that commingled trust assets are not "profits" subject to the conjunctively-stated disgorgement requirement of that section. *Leigh v.*

---

[8]ERISA § 405(a) provides that an ERISA fiduciary is subject to joint and several liability where the fiduciary knowingly participates in the breaches of another fiduciary, "knowing such act or omission is a breach" or "if he has knowledge of a reach by such other fiduciary unless he makes reasonable efforts in the circumstances to remedy the breach." 29 U.S.C. §§ 1105(a)(1) & (3).

*Engle*, 727 F.2d 113, 138-39 (7th Cir. 1984). Here, class plaintiffs have showed loss to the plans (i.e., the adjudicated-valid but unpaid benefit claims) in an amount of $10,320,418.00 resulting from the NAI defendants' breaches of fiduciary duty. Findings of Fact, ¶¶ 17-18. Under the cumulative damage provisions of § 409(a), the NAI defendants' breaches entitle plaintiffs to that amount plus disgorgement of the breaching fiduciaries' profits. Because the NAI defendants have not even appeared to defend this matter, they perforce have failed to carry their burden under *Leigh* to show what, if any, portion of the assets received by NAI and not paid out in claims cannot be considered "profit" for purposes of § 409(a).

16.    As described in Findings of Fact ¶ 18 above, the best evidence indicates that with respect to subclass no. 1 (the AHHA participants), NAI profited in the amount of $5,077,336.00. With respect to subclass no. 2 (the MHI participants), the evidence indicates an additional profit of $4,674,116.00. Findings of Fact ¶ 19. When disgorgement of these profits is added to the plans' loss under § 409(a), the Court concludes that the named plaintiffs and class plaintiffs are entitled to judgment in the amount of $20,071,870.00 plus pre-judgment interest.

17.    The Court recognizes that the two related cases before it, this cause and the cause styled *Connelly Management Co. Welfare Benefit Plan vs. North American Indemnity N.V.*, Cause No. 1:07-cv-540-LJM-JMS, involve claims on behalf of the participants and beneficiaries of the approximately 409 ERISA welfare benefit plans insured by the NAI defendants and the plans themselves, respectively. To the extent that the plans have already paid the claims of their participants and beneficiaries any recovery on the judgment entered herein redounds to the benefit of the plan. Conversely, to the extent that the participants' and beneficiaries' claims have not been paid by their plans, the participants and beneficiaries are entitled to recovery. If necessary, with the

agreement of counsel for class plaintiffs, the Court may appoint a Special Master to supervise post-judgment claims proceedings determining the disbursement of recovered funds on a plan- and participant-specific basis. *See* 3 NEWBERG ON CLASS ACTION § 10:12, at 505-07 (4th Ed. 2002) (after judgment, "individual claims may be processed by a special master or by a committee of counsel appointed by the [c]ourt. The drain on judicial resources is thus reduced and the processing of claims may be simplified because a lesser standard of proof may be applied without jeopardizing the defendant's due process rights, the defendant having been given full opportunity to challenge damages on a class basis at trial.")

18.     As prevailing parties, at the Court's discretion plaintiffs and class members may also receive an award of reasonable attorneys' fees and costs under § 502(g) of ERISA, 29 U.S.C. § 1132(g). Counsel for class plaintiffs are directed to submit a fee application within thirty days of the entry of judgment for the Court's consideration.

19.     Class plaintiffs shall submit their petition for pre-judgment interest **before** Tuesday, April 15, 2008, so that the Court may enter judgment on April 15, 2008, that includes said pre-judgment interest amounts.

IT IS SO ORDERED this 8th day of April, 2008.

LARRY J. McKINNEY, JUDGE
United States District Court
Southern District of Indiana

Distribution attached.

25

Distributed electronically to:

G. Daniel Kelley Jr.
ICE MILLER LLP
daniel.kelley@icemiller.com

Edward Price Steegmann
ICE MILLER LLP
ed.steegmann@icemiller.com

Distributed via U.S. Postal Service to:

Allan G. Levine
CHRISTIAN SMITH & JEWELL
2302 Fannin, Suite 500
Houston, TX 77002